UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| FINTEC GROUP, INC., individually and on behalf of all others similarly situated, ) ) ) Plaintiff, ) ) v. ) ) U.S. BANK, N.A., ) ) Defendant. ) | No. 13 C 8076<br><br>Judge Sara L. Ellis |

## OPINION AND ORDER

This is one of several actions, and one of two pending in this Court, arising from the collapse of Peregrine Financial Group ("Peregrine") in July 2012.[1] This putative class action is brought by Fintec Group, Inc. ("Fintec") on behalf of introducing brokers who placed contracts of sale of commodities or deposited security deposits with Peregrine and have not received commissions that are due and payable to them and/or have not received return of their security deposits from Peregrine. Fintec seeks recovery not from Peregrine or Russell R. Wasendorf, Sr., Peregrine's CEO, but rather from U.S. Bank, N.A. ("U.S. Bank"), where Peregrine maintained a customer segregated account from which Fintec alleges Wasendorf misappropriated customer funds for his own purposes. U.S. Bank seeks dismissal of all the claims brought against it in Fintec's First Amended Class Action Complaint (the "Complaint"): aiding and abetting violations of the Commodity Exchange Act ("CEA") (Count I); violation of the CEA (Count II); aiding and abetting fraud (Count III); aiding and abetting conversion (Count IV); and negligence (Count V). U.S. Bank's motion to dismiss [41] is granted in part and denied in part. Fintec has

---

[1] A related class action on behalf of former investors, *In re Peregrine Financial Group Customer Litigation*, No. 12 C 5546, is also pending before this Court. The Court is issuing an Opinion on U.S. Bank's motion to dismiss the claims against it in that case concurrent with the issuance of this Opinion.

standing to pursue claims based on the alleged inclusion of its security deposit in the customer segregated account but cannot pursue claims to recover unpaid commissions, which were general obligations of Peregrine and thus not subject to the same protections. Because Fintec was not a U.S. Bank customer, the negligence claim is dismissed. Fintec also has not alleged that U.S. Bank had actual knowledge of Wasendorf's misconduct, and so the common law aiding and abetting claims are dismissed. However, Fintec may pursue its CEA claims, including the aiding and abetting claim for which Fintec need only have alleged conscious avoidance and not actual knowledge.

## BACKGROUND[2]

### I. Fintec and Peregrine

Fintec is an introducing broker registered with the Commodity Futures Trading Commission ("CFTC"). Introducing brokers are those engaged in soliciting or accepting orders for the purchase or sale of commodities. They do "not accept any money, securities, or property (or extend credit in lieu thereof) to margin, guarantee, or secure any trades or contracts that result or may result therefrom." 7 U.S.C. § 1a(31)(A)(i)(II).

Wasendorf established Peregrine in 1990 and was its CEO until its demise. Peregrine was a futures commission merchant ("FCM"), which, unlike an introducing broker, could accept money, securities, and property to margin, guarantee, and secure trades and contracts. As an FCM, Peregrine was regulated by the CFTC and the National Futures Association ("NFA"). Pursuant to these rules, Peregrine was required to keep its customers' money in a separate

---

[2] The facts in the background section are taken from Fintec's First Amended Class Action Complaint and the exhibits attached thereto and are presumed true for the purpose of resolving U.S. Bank's motion to dismiss. *See Virnich v. Vorwald*, 664 F.3d 206, 212 (7th Cir. 2011); *Local 15, Int'l Bhd. of Elec. Workers, AFL-CIO v. Exelon Corp.*, 495 F.3d 779, 782 (7th Cir. 2007). The Court may also take judicial notice of matters of public record. *Gen. Elec. Capital Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1080–81 (7th Cir. 1997).

account maintained solely for the customers' benefit. 7 U.S.C. § 6d(a)(2); 17 C.F.R. § 1.20(a). The account was to bear a name identifying it as a customer segregated account. 17 C.F.R. § 1.20(a). Although Peregrine was allowed to commingle one customer's funds with another's in a single account, it could not commingle customer funds with its operational funds or use customer funds to guarantee trades or contracts, or secure or extend the credit of anyone but the customer. 17 C.F.R. § 1.20(c). Peregrine could hold excess funds in its customer segregated funds accounts and withdraw those excess funds for its own use, however. 17 C.F.R. § 1.23. Similar to the restrictions on an FCM's use of money in a customer segregated account, the bank where the account is held cannot use money in the account for any purpose "except to purchase, margin, guarantee, secure, transfer, adjust or settle trades, contracts, or commodity option transactions of futures customers." 17 C.F.R. § 1.20(a). The bank must sign a written acknowledgment that futures customers' funds are deposited in the account and are being held in accordance with the CEA. *Id.*

Introducing brokers like Fintec work with FCMs to place orders for Fintec's customers. The arrangement between the introducing broker and the FCM is typically memorialized in a separate contract. Peregrine and Fintec entered into such an introducing broker agreement on June 4, 2009. Peregrine represented in the agreement that it was in compliance with the capital and financial reporting requirements to which it was subject, including those under the CEA. Fintec relied on Peregrine to disclose any deficiencies in its reporting requirements and to maintain compliance with those requirements. The parties' agreement made Fintec responsible for its customer obligations, with Fintec "guarantee[ing] all the financial obligations of the Customer Accounts of Customers serviced by" Fintec. Ex. A to Complaint ¶ 11.0(a). As security for its customers' orders and to ensure Fintec's compliance with its obligations under the

3

agreement, Fintec was required to make a security deposit with Peregrine. Peregrine had the discretion to deduct amounts from the security deposit if it determined it was entitled to payment from Fintec. In compliance with its agreement, Fintec made a $50,000 security deposit to Peregrine, which Peregrine identified as having been deposited in a "reg seg" account. Compl. ¶ 33. The security deposit could be deposited in a customer segregated account because it constituted deposits against possible future uncollectible amounts from accounts serviced by Fintec.

Pursuant to the agreement, Fintec was entitled to commissions on orders it placed through Peregrine. Peregrine was to pay these commissions to Fintec within fifteen days after the end of the month during which they were earned. But Peregrine could use any earned commissions to satisfy obligations a Fintec customer owed Peregrine. Peregrine did not pay Fintec the commissions it was due for June and the first nine days of July 2012.

## II.     Peregrine and U.S. Bank

Wasendorf was a well-known businessman in Cedar Falls, Iowa and a valued customer of U.S. Bank's Cedar Falls branch, where he maintained over thirty accounts for himself and entities and individuals with whom he was affiliated.[3] As required by the CEA, Peregrine deposited customer funds in a customer segregated account at U.S. Bank known as the 1845 Account. U.S. Bank provided a written acknowledgment to Peregrine that the funds deposited in that account would be maintained in strict compliance with the CEA. U.S. Bank's records and documents referred to the 1845 Account as a customer segregated account. In addition, U.S. Bank was aware of Peregrine's agreements with introducing brokers, including Fintec, and knew that Fintec's security deposit was a guarantee of the obligations of its customers.

---

[3] Wasendorf's accounts were initially with Firstar Corporation, which merged with U.S. Bancorp, U.S. Bank's parent company, in 2001. The Court will refer to Firstar and U.S. Bank interchangeably for purposes of this Opinion.

Peregrine's and Wasendorf's other accounts at U.S. Bank, including the 1845 Account, were primarily monitored by Banker A, an Assistant Relationship Manager in the Cedar Falls branch, who personally processed outgoing wire transfers and cashier checks from the 1845 Account that were initiated by Wasendorf by phone or fax. Although U.S. Bank has account opening documents and signature cards for all other Peregrine and Wasendorf accounts maintained at U.S. Bank, it has been unable to locate any account opening documents, signature cards, or written acknowledgments for the 1845 Account. Access to the 1845 Account was limited solely to Wasendorf, in response to Wasendorf's instruction that no one at U.S. Bank should speak with any Peregrine employees, aside from Wasendorf and his personal assistant, regarding that account.

Although the 1845 Account was a customer segregated account, there were numerous large withdrawals and transfers from that account, many to other accounts at U.S. Bank affiliated with Wasendorf. Banker A was aware of the flow of funds out of the 1845 Account because U.S. Bank's procedures required verification of each outgoing transaction over $10,000 with Wasendorf. Over $325 million flowed through this account between May 2005 and June 2012. Between June 2008 and June 2012, over $118 million was deposited into the 1845 Account, over 94% of which was customer funds. Over the same time period, over 30% of those funds were used by Wasendorf for non-customer use, such as to fund his divorce settlement, his restaurant, his personal investments in Romania, and his private airplane.

Banker A was aware of the CEA segregation requirements and calculated the amount of customer segregated funds Peregrine maintained in the 1845 Account at various times when preparing documents for loans U.S. Bank extended in 2008 to Wasendorf Construction, another business run by Wasendorf, and the Wasendorfs. Although U.S. Bank acknowledged it could

5

not rely upon Peregrine to guarantee the Wasendorf Construction loan, it nevertheless did. Peregrine granted U.S. Bank a security interest in all Peregrine property in U.S. Bank's possession, including the 1845 Account, and granted U.S. Bank a contractual right of setoff against any account balances, cash, and other property in U.S. Bank's possession. U.S. Bank considered the 1845 Account, which had the largest balance of all of Peregrine's and Wasendorf's accounts at the time, as part of the guaranty. U.S. Bank also used the 1845 Account to guarantee loans made to Wasendorf and his then-wife on the same terms.

### III.  Wasendorf's Fraud

Ultimately, Wasendorf withdrew over $200 million from the 1845 Account for non-customer use. To conceal his conduct, he diverted mail intended for U.S. Bank to a post office box he rented in Cedar Falls. This meant U.S. Bank did not receive the typical balance confirmation requests for Peregrine's accounts from the NFA or Peregrine's auditor. As a result, Wasendorf was able to represent to the NFA, Peregrine's auditor, and its customers that Peregrine maintained a customer segregated account at U.S. Bank that had over $200 million when the average balance of that account since May 2005 was only approximately $15.7 million.[4] U.S. Bank did receive a balance confirmation request from the NFA for the 1845 Account in May 2011, however, which U.S. Bank truthfully completed and returned to Peregrine and the NFA. But Wasendorf learned of this and thereafter sent a replacement form indicating that there was not just over $7 million in the 1845 Account, as U.S. Bank had indicated, but rather $220 million in that account. U.S. Bank did not receive any additional balance confirmation requests from Peregrine, the NFA, or Peregrine's auditor and never followed up to determine why the May 2011 request was the only one it received. Wasendorf also filed other

---

[4] As another example, Peregrine's August 2004 financial statement, which Banker A reviewed, listed a balance for the customer segregated account at U.S. Bank of over $90 million. The account balance in the 1845 Account never exceeded $54 million.

6

fraudulent forms with federal regulators and made fraudulent statements to the general public that concealed Peregrine's non-compliance with the CEA and other governing regulations.

In mid-2012, however, Wasendorf recognized that his scheme was going to collapse and his fraud would be exposed. On July 9, 2012, he attempted suicide, leaving a confession and suicide note admitting to fraud. Peregrine subsequently declared bankruptcy. Wasendorf pleaded guilty to fraud and embezzlement and is currently serving a fifty year sentence.

## LEGAL STANDARD

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint, not its merits. Fed. R. Civ. P. 12(b)(6); *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). In considering a Rule 12(b)(6) motion to dismiss, the Court accepts as true all well-pleaded facts in the plaintiff's complaint and draws all reasonable inferences from those facts in the plaintiff's favor. *AnchorBank, FSB v. Hofer*, 649 F.3d 610, 614 (7th Cir. 2011). To survive a Rule 12(b)(6) motion, the complaint must not only provide the defendant with fair notice of a claim's basis but must also be facially plausible. *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

Rule 9(b) requires a party alleging fraud to "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). This "ordinarily requires describing the 'who, what, when, where, and how' of the fraud, although the exact level of particularity that is required will necessarily differ based on the facts of the case." *AnchorBank*, 649 F.3d at 615 (citation omitted). Rule 9(b) applies to "all averments of fraud, not claims of fraud." *Borsellino v.*

7

*Goldman Sachs Grp., Inc.*, 477 F.3d 502, 507 (7th Cir. 2007). "A claim that 'sounds in fraud'—in other words, one that is premised upon a course of fraudulent conduct—can implicate Rule 9(b)'s heightened pleading requirements." *Id.*

## ANALYSIS

### I. Prudential Standing

U.S. Bank challenges Fintec's ability to bring this suit, arguing first, that all claims must be dismissed because Fintec is improperly seeking to recover based on the rights of Peregrine customers and second, that Fintec's CEA claims should be dismissed because Fintec does not have standing to maintain a private right of action under that statute. To maintain its suit, Fintec must demonstrate that it has standing, which has both constitutional and prudential components. *Edgewood Manor Apartment Homes, LLC v. RSUI Indem. Co.*, 733 F.3d 761, 771 (7th Cir. 2013). U.S. Bank focuses on Fintec's prudential standing, which generally requires Fintec to assert its own legal rights and interests and not those of third parties.[5] *Id.* Although many of Fintec's allegations do focus on Peregrine's duties to its customers, Fintec nonetheless has alleged its own interest in the security deposit it made to Peregrine and the commissions it is owed from June and July 2012.

U.S. Bank contends that the security deposit does not suffice to establish standing because the CEA and regulations prohibit an FCM from depositing a security deposit in a

---

[5] U.S. Bank does not challenge Fintec's constitutional standing, i.e. that Fintec have an injury in fact traceable to U.S. Bank's conduct that is likely to be redressed by the relief requested. *Edgewood Manor*, 733 F.3d at 771. It nonetheless emphasizes in its briefing that Fintec has not alleged that Peregrine deposited Fintec's security deposit and commissions at U.S. Bank or, more specifically, in the 1845 Account, which would suggest that constitutional standing may not be met. U.S. Bank ignores one allegation in Fintec's Complaint, however, that, "[u]pon information and belief, Plaintiff deposited with U.S. Bank money in connection with orders to make such contracts," which can be read to suggest that the security deposit was deposited at U.S. Bank. Compl. ¶ 148. When read in conjunction with the allegation that the security deposit was placed in a "regulated segregated account," *id.* ¶ 33, the Complaint can be read as alleging that the security deposit was placed in the 1845 Account. Thus, at this stage, the Court is satisfied that Fintec has alleged a connection to U.S. Bank.

customer segregated account. U.S. Bank, however, engages in selective quotation of the CFTC's interpretation of these rules to support its position. The CFTC's interpretation relating to transactions between FCMs and introducing brokers states:

> Any funds which an FCM receives from an [introducing broker] which are in the nature of a security deposit (other than to margin commodity positions on contract markets, such as deposit against possible future uncollectible amounts from accounts serviced by the [introducing broker]), must be deposited in an account other than an account used to segregate funds for commodity customers.

Financial & Segregation Interpretation No. 14 ("Interpretation No. 14") (July 18, 1995), available at http://www.cftc.gov/tm/finseginterp_14.htm. Fintec's agreement with Peregrine provided that Fintec guaranteed all its customers' financial obligations and thus the security deposit can be read, at least for purposes of this motion to dismiss, as a deposit against future uncollectible amounts so that it could properly be deposited in the 1845 Account. Moreover, Fintec has alleged that it received a statement that its security deposit was maintained in a "regulated segregated" account, Compl. ¶ 33, which, when combined with the allegation that Fintec's money was deposited at U.S. Bank, suggests that it was deposited in the 1845 Account. Thus, U.S. Bank's argument that the security deposit cannot provide Fintec with prudential standing is unavailing.

But U.S. Bank has a better argument with respect to Fintec's attempt to recover unpaid commissions. Although Fintec alleges that customer funds could be withdrawn from the 1845 Account as necessary to pay commissions to Fintec and other introducing brokers, this allegation is directly contradicted by the CFTC's Interpretation No. 14, which states:

> Commissions earned by [introducing brokers] are not necessary to the execution of commodity trades and maintenance of any resulting positions. Consequently, commissions due an [introducing broker] constitute a general obligation of the FCM and, as such, may not be paid by the FCM directly out of funds segregated for the benefit of the commodity customers . . . .

9

> . . . .
>
> In the bankruptcy of an FCM, [introducing brokers] are general creditors of the FCM with respect to any commissions or other fees owing to them by the FCM for services rendered to the FCM. Consequently, they have no claim for such commissions or fees against any assets segregated by the FCM for the benefit of its commodity customers pursuant to Section 4d(2) of the [CEA] and Section 1.20 of the Commission's regulations . . . .
>
> . . . .
>
> [Introducing brokers'] contractual claims against an FCM for commissions owed them as a result of their servicing customers' accounts for the FCM cannot be satisfied with funds segregated for customers.

Interpretation No. 14. The commissions Fintec seeks are not afforded the same protection as the security deposit might be, and thus any claims for recovery of unpaid commissions are dismissed.

## II.     Standing to Assert CEA Claims

Fintec asserts two claims under the CEA, the first that U.S. Bank is liable for aiding and abetting Peregrine's violations of the CEA and the second that U.S. Bank is directly liable to Fintec for its own violations of the CEA. Section 22(a) of the CEA provides a limited private right of action for CEA violations, as long as certain conditions are met. Section 22(a) reads, as relevant here:

> (1) Any person (other than a registered entity or registered futures association) who violates this chapter or who willfully aids, abets, counsels, induces, or procures the commission of a violation of this chapter shall be liable for actual damages resulting from one or more of the transactions referred to in subparagraphs (A) through (D) of this paragraph and caused by such violation to any other person—
>
> . . .
>
> (B) who made through such person any contract of sale of any commodity for future delivery (or option on such contract or any

>commodity) or any swap ; or who deposited with or paid to such person money, securities, or property (or incurred debt in lieu thereof) in connection with any order to make such contract or any swap;
>
>(C) who purchased from or sold to such person or placed through such person an order for the purchase or sale of—
>
>(i) an option subject to section 6c of this title (other than an option purchased or sold on a registered entity or other board of trade);
>
>(ii) a contract subject to section 23 of this title; or
>
>(iii) an interest or participation in a commodity pool; or
>
>(iv) a swap[.]

7 U.S.C. § 25(a). To bring a claim for direct liability against U.S. Bank, Fintec must demonstrate that it participated in one of the transactions listed in subsection (B) or (C) with U.S. Bank. *Id.* For its aiding and abetting claim, however, Fintec need only demonstrate that it participated in one of the transactions listed with Peregrine. *Damato v. Hermanson*, 153 F.3d 464, 470–71 (7th Cir. 1998).

Fintec argues that it has standing to bring its direct liability claim because it deposited its security deposit with U.S. Bank "in connection with orders to make such contracts." Compl. ¶ 148. U.S. Bank again relies on Interpretation No. 14 to argue that the security deposit cannot represent funds deposited to guarantee or secure an introducing broker's trades. But the Court has already rejected this position in light of the allegations of the Complaint and the need to read all inferences in favor of Fintec at this stage. Although the security deposit was indeed a requirement of Fintec's agreement with Peregrine, read broadly, it was required in order to guarantee the trades Fintec sought to place with Peregrine. The Court finds a payment to guarantee commodity trades to meet the plain language of subsection (B)'s "in connection with" requirement. The Court does not understand that subsection to require Fintec to identify a

11

specific order to which its deposit of funds was related. *But see Unity House, Inc. v. First Commercial Fin. Grp.*, No. 96C-1716, 1997 WL 701345, at *6 (N.D. Ill. Nov. 5, 1997) (noting that "[c]ases interpreting the term 'in connection with' under CEA § 4(b) hold that a plaintiff who was never a 'party to an order for the sale of a commodity' does not meet the 'in connection with' requirement" (quoting *Tatum v. Legg Mason Wood Walker*, 83 F.3d 121, 123 (5th Cir. 1996))), *abrogated on other grounds by Damato*, 153 F.3d 464. Thus, the Court will allow Fintec to proceed on its direct liability claim against U.S. Bank.[6]

A similar analysis applies to the aiding and abetting claim, where the security deposit was made to Peregrine in connection with the customer orders Fintec planned to place with Peregrine. Alternatively, Fintec may proceed under subsection (C), for it placed its customers' orders through Peregrine. *See Ray v. Bergen*, No. 03 C 1115, 2003 WL 22175547, at *1 (N.D. Ill. 2003) (an introducing broker "solicits and accepts orders for futures and option trades and places those trades with a clearing broker"). U.S. Bank all but admits this by stating that Fintec "acted 'on behalf' of its customers to transmit *their* orders." Reply at 5. Thus, *Klein & Co. Futures, Inc. v. Board of Trade of the City of New York*, 464 F.3d 255 (2d Cir. 2006), which U.S. Bank relies on, is distinguishable. In *Klein*, which is not binding on this Court, the Second Circuit considered a claim brought against an exchange under CEA § 22(b), which only allows claims to be brought by a "private litigant 'who engaged in . . . transaction[s] on or subject to the rules of' a contract market." *Id.* at 260 (alterations in original) (quoting 7 U.S.C. § 25(b)(1)-(3)).

---

[6] U.S. Bank argues in footnotes in its opening memorandum and reply that Fintec's direct liability claim also fails because Fintec has not alleged a violation of the CEA. Initially, its argument was based on Interpretation No. 14, which the Court has already rejected. In reply, U.S. Bank argues that Fintec has disclaimed reliance on a violation of CEA § 4d(b) by stating in its response that its claims are premised on CEA § 4d(a)(2), which does not create liability for a bank. The Court does not understand Fintec to be abandoning its claim that U.S. Bank violated § 4d(b) and thus the Court will not dismiss the claim on that basis. But, if Fintec is indeed seeking to amend its direct violation claim and premise it on a violation of § 4d(a)(2), the Court agrees with U.S. Bank that § 4d(a)(2) does not apply to banks.

The Second Circuit stated that a plaintiff must also fall within one of the subdivisions of § 22(a)(1), noting that "[t]he common thread of these four subdivisions is that they limit claims to those of a plaintiff who actually traded in the commodities market." *Id.* at 259–60. The plaintiff in *Klein* did not, however, because it admitted it had no financial interest in the account at issue, that it did not trade the contracts at issue, and that all trades at issue were unsolicited. *Id.* at 260. The Second Circuit noted that the plaintiff "functioned merely as a broker or agent that earned commissions for handling its customers [*sic*] trades." *Id.* But here, the Complaint does not foreclose the possibility that Fintec had more involvement in trades than the plaintiff in *Klein*, which functioned merely as a clearing agent. Instead, as Fintec argues, its role appears more like that of the advisor in *Sundial International Fund Limited v. Delta Consultants, Inc.*, to whom investors gave money to conduct trades. 923 F. Supp. 38, 40–41 (S.D.N.Y. 1996) ("It would appear clear that it was Dunn and his entities who made the contracts of currency exchange trading 'through' the banks. Plaintiffs did not do so."). Thus, at this stage, the Court finds that Fintec has standing to proceed with its CEA claims against U.S. Bank.

**III.     Negligence Claim**

To state a claim for negligence, Fintec must allege that U.S. Bank owed it a duty of care. *See Setera v. Nat'l City Bank*, No. 07 C 2978, 2008 WL 4425446, at *4 (N.D. Ill. Sept. 26, 2008) ("A claim for negligence requires that the defendant breach a duty of care owed to the plaintiff."). But Fintec was not a U.S. Bank customer, and banks do not owe a duty of care to non-customers. *See Setera*, 2008 WL 4425446, at *4 (collecting cases); *Thompson v. Capital One Bank, Inc.*, 375 F. Supp. 2d 681, 683–84 (N.D. Ill. 2005). Fintec's reliance on *Lerner v. Fleet Bank*, 459 F.3d 273 (2d Cir. 2006), a Second Circuit case applying New York law, is unavailing. Indeed, Fintec's quotation from *Lerner* suggests not that a negligence claim is viable

13

but rather that it may have a claim against U.S. Bank for its participation in Peregrine's breach of fiduciary duty. *See Crawford Supply Grp., Inc. v. Bank of Am., N.A.* (*Crawford Supply III*), 829 F. Supp. 2d 636, 642–43 (N.D. Ill. 2011) ("[T]he court may impose a constructive trust upon benefits received by a third party because of that party's participation in or knowledge of a breach of fiduciary duty."). Although Fintec may desire to amend its complaint to include allegations to support such a claim, the Court will at this time dismiss the negligence claim for lack of a cognizable duty.

## IV. Aiding and Abetting Claims

Fintec brings three claims against U.S. Bank based on aiding and abetting liability, alleging that U.S. Bank aided and abetted Peregrine's CEA violations (Count I), Peregrine's and Wasendorf's fraud (Count III), and Wasendorf's conversion of the funds in the 1845 Account (Count IV). The standard for Fintec's claim for aiding and abetting the CEA violations is slightly different from that for aiding and abetting fraud and conversion. To state a claim for aiding and abetting a CEA violation, Fintec must allege that U.S. Bank (1) had knowledge of Peregrine's intent to commit a violation of the CEA, (2) had the intent to further that violation, and (3) committed some act in furtherance of Peregrine's objective. *Damato*, 153 F.3d at 473. Aiding and abetting liability under the CEA is "coterminous with the criminal standard of aiding and abetting liability," *id.* at 472, which allows knowledge to be demonstrated not only by actual knowledge but also by conscious avoidance of the truth, *Weber v. E.D. & F. Man Int'l, Inc.*, No. 97 C 7518, 1999 WL 35326, at *4 (N.D. Ill. Jan. 13, 1999). To state a claim for aiding and abetting fraud or conversion, Plaintiffs must allege that (1) Peregrine or Wasendorf performed a wrongful act that caused injury, (2) U.S. Bank was aware of its role when it provided assistance, and (3) U.S. Bank knowingly and substantially assisted the violation. *Time Savers, Inc.*, 863

N.E.2d at 1168. The parties do not dispute that knowledge cannot be shown under the conscious avoidance doctrine for Fintec's common law aiding and abetting claims.

Fintec maintains that it has alleged both actual knowledge and, alternatively, conscious avoidance. The basis for its aiding and abetting claims is similar to that set forth by Plaintiffs in response to U.S. Bank's motion to dismiss in the related *In re Peregrine Financial Group Customer Litigation*. For example, Fintec alleges that U.S. Bank employees knew the 1845 Account was a customer segregated account but processed transfers of funds from that account to Wasendorf personally or to accounts that he controlled. Fintec alleges that although more than 94% of the funds deposited into the 1845 Account between June 2008 and June 2012 were customer funds, over 30% of those funds were used by Wasendorf for personal expenditures and for his other companies. But "the deposit or transfer of money by a fiduciary into his personal accounts does not, without more, give rise to the inference that a bank had actual knowledge of wrongdoing or bad faith." *Crawford Supply Grp., Inc. v. LaSalle Bank, N.A.* (*Crawford Supply I*), No. 09 C 2513, 2010 WL 320299, at *7 (N.D. Ill. Jan. 21, 2010) (collecting cases); *see also Weber*, 1999 WL 35326, at *4 ("[T]he Seventh Circuit draws a sharp distinction between 'strong suspicion' and mere curiosity."). Fintec also points to allegations that U.S. Bank was aware of Peregrine's and Wasendorf's finances, the use of the 1845 Account as security for loans to Wasendorf, his then-wife, and Wasendorf Construction, and the inconsistent naming of the 1845 Account in U.S. Bank's systems. According to Fintec, these allegations establish that U.S. Bank knew of Peregrine's and Wasendorf's fraud. Although these allegations are indicative of bad faith in that they put U.S. Bank on notice of wrongdoing and required further investigation, they do not create the inference that U.S. Bank had actual knowledge that fraud was occurring. *See Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 292–94 (2d Cir. 2006) (red flags "may have put the

15

banks on notice that some impropriety may have been taking place" but they "do not create a strong inference of Schick's outright theft of client funds"). Thus, Fintec's common law aiding and abetting claims (Counts III and IV) must be dismissed.[7]

But Fintec's CEA aiding and abetting claim may proceed, for Fintec has sufficiently alleged conscious avoidance. Under such a theory, Fintec must allege that U.S. Bank's knowledge can be inferred from a "'deliberate effort' to avoid guilty knowledge where it has a 'strong suspicion' of wrongdoing."[8] *Weber*, 1999 WL 35326, at *4 (quoting *United States v. Draves*, 103 F.3d 1328, 1333 (7th Cir. 1997)). Taken as a whole, Fintec's Complaint suffices to meet this standard.

The 1845 Account was not an ordinary account, but a customer segregated account where it would be unlikely to see such a high volume of and routine transfers to non-Peregrine accounts controlled by Wasendorf at U.S. Bank. And although an FCM like Peregrine could deposit excess funds in a customer segregated account and withdraw such funds for its own use, the Complaint makes clear that the withdrawals could not have been solely excess Peregrine funds where between June 2008 and June 2012 over 94% of deposits were from customer funds but 30% of the deposits over the same time period were used by Wasendorf for personal expenditures and for his other companies. Fintec also alleges that Wasendorf's business was highly valued by U.S. Bank, giving U.S. Bank a reason not to investigate his actions and instead

---

[7] Because the Court dismisses the common law aiding and abetting conversion claim on this basis, it need not address U.S. Bank's alternative argument that Fintec has not alleged an underlying claim for conversion.

[8] This is similar to the bad faith standard under the Illinois Fiduciary Obligations Act, discussed in the Court's Opinion on U.S. Bank's motion to dismiss in *In re Peregrine Financial Group Customer Litigation*. *Mikrut v. First Bank of Oak Park*, 832 N.E.2d 376, 385, 359 Ill. App. 3d 37, 295 Ill. Dec. 225 (2005) (bad faith includes situations "where the bank suspects that the fiduciary is acting improperly and deliberately refrains from investigating in order that it may avoid knowledge that the fiduciary is acting improperly" (internal quotation marks omitted) (citation omitted)).

to give him preferential treatment. *See U.S. C.F.T.C. v. U.S. Bank, N.A.*, No. 13-CV-2041-LRR, 2013 WL 5944179, at *12 (N.D. Iowa Nov. 5, 2013) ("[T]he Commission points out that Wasendorf and his businesses had many other accounts at U.S. Bank and, presumably, if U.S. Bank had not issued the Wasendorfs' loan or extended the Construction loan—of which the 1845 Account allegedly was the primary security—Wasendorf plausibly could have closed these other accounts, which could have been financially detrimental to U.S. Bank."); *cf. Crawford Supply I*, 2010 WL 320299, at *9 (finding no basis for an inference of bad faith where, among other things, there was no allegation that the bank gave the fiduciary "preferential treatment or assistance"). These allegations allow the Court to draw the inference, at this stage, that U.S. Bank deliberately avoided learning of Peregrine's misconduct. *See U.S. C.F.T.C.*, 2013 WL 5944179, at *14 (court could draw inference that U.S. Bank was liable for CEA violation for improper transfers out of 1845 Account based on allegations that U.S. Bank knew Peregrine did not have enough excess funds to cover transfers and that U.S. Bank knew Wasendorf was not transferring funds to benefit Peregrine customers); *Falk v. N. Trust Co.*, 763 N.E.2d 380, 387–88, 327 Ill. App. 3d 101, 261 Ill. Dec. 410 (2001) (finding plaintiff had sufficiently alleged bad faith by a bank by alleging that fiduciary had transferred principal's funds into own account, fiduciary used funds to pay personal loan owed to the bank, and the bank had reviewed the fiduciary's tax returns and other financial statements and was aware she had insufficient income to support the account and loan activity she was generating); *cf. Weber*, 1999 WL 35326, at *4 (plaintiffs could not rely on conscious avoidance theory where the defendant had only four isolated dealings with party accused of fraud).

This conclusion is buttressed by U.S. Bank's actions in extending loans to Wasendorf, his then-wife, and Wasendorf Construction. The fact that U.S. Bank relied on the 1845 Account as

17

security for the loans to Wasendorf, his then-wife, and Wasendorf Construction, all while being aware that the 1845 Account comprised almost the entirety of the balances of Peregrine's accounts at U.S. Bank, suggests that U.S. Bank at least had facts before it that should have caused it to inquire as to whether the use of the 1845 Account as security was proper or instead violated the CEA.[9] *See U.S. C.F.T.C.*, 2013 WL 5944179, at *12 (finding CFTC adequately alleged CEA violation based on U.S. Bank's use of 1845 Account to secure the Wasendorf loans where the CFTC alleged "that U.S. Bank 'used,' or availed itself, of the 1845 Account when it entered into the 2008 and 2011 guaranties with Peregrine, which enabled U.S. Bank to collect interest on the associated loans"). Thus, the knowledge element is sufficiently stated.

U.S. Bank also challenges Fintec's ability to satisfy the second element, intent, but that challenge appears to be premised entirely on its contention that it had no knowledge of Peregrine's and Wasendorf's violations. As the Court has found knowledge based on the conscious avoidance doctrine, it will not further examine whether Fintec has adequately alleged intent. The Court notes, however, that the *Weber* court at least left the possibility open that intent could be inferred from behavior rising to the level of conscious avoidance. *Weber*, 1999 WL 35326, at *4; *Weber v. E.D. & F. Man Int'l, Inc.*, No. 97 C 7518, 1999 WL 258496, at *3 & n.6 (N.D. Ill. Apr. 9, 1999) (noting it "need not take a position on the validity of applying the 'ostrich' theory to a determination of intent," while also stating that "without conscious avoidance, there can likewise be no intent"). Thus, Fintec's claim for aiding and abetting

---

[9] Plaintiffs also allege that U.S. Bank accepted money from the 1845 Account as repayments on the loans. They acknowledge, however, that the money was first transferred to a different Wasendorf-related account, which undercuts their argument that U.S. Bank should have been suspicious for this reason, as banks do not have a duty to "cross-referenc[e] the accounts of all those who had dealings with the bank and acted as fiduciaries with their personal incomes and other assets." *Crawford Supply Grp., Inc. v. Bank of Am., N.A.* (*Crawford Supply II*), No. 09 C 2513, 2011 WL 1131292, at *8 (N.D. Ill Mar. 28, 2011).

Peregrine's CEA violations will be allowed to proceed to discovery and any issues regarding intent may be taken up at summary judgment.

## CONCLUSION

For the foregoing reasons, U.S. Bank's motion to dismiss the First Amended Class Action Complaint [41] is granted in part and denied in part. Fintec's claims for aiding and abetting fraud and conversion (Counts III and IV) are dismissed without prejudice. Fintec's claim for negligence (Count V), in addition to its requests for relief regarding unpaid commissions, are dismissed with prejudice. U.S. Bank is ordered to answer the remaining counts of the First Amended Class Action Complaint by October 9, 2014.

Dated: September 25, 2014

_____
SARA L. ELLIS
United States District Judge